## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| O'HARA CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:19-cv-00467-NT |
| | ) | |
| AUTONAV MARINE SYSTEMS, INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| | ) | |
| PAUL WAGNER, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTION TO DISMISS

Before me is the Defendants' motion to dismiss the Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2). ("**Defs.' Mot.**") (ECF No. 7). For the reasons stated below, the motion to dismiss is **GRANTED**.

## BACKGROUND

When evaluating a motion to dismiss for lack of personal jurisdiction, I take "the plaintiff's properly documented evidentiary proffers as true and construe them in the light most favorable to the plaintiff's jurisdictional claim." *PREP Tours, Inc. v. Am. Youth Soccer Org.*, 913 F.3d 11, 16–17 (1st Cir. 2019) (alterations, quotation marks, and citations omitted). I also consider undisputed facts that are offered by the defendant. *Id; see also Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016).

Plaintiff, O'Hara Corporation ("**O'Hara**" or the "**Plaintiff**"), is a fully integrated fishing vessel operator that catches, processes, and packages seafood with operations on the East Coast and in the Pacific Northwest of the United States. Compl. ¶¶ 1, 5 (ECF No. 6-4); Declaration of Frank O'Hara ¶ 7 ("**O'Hara Decl.**") (ECF No. 10-1). O'Hara is a Maine corporation with its principal place of business in Rockland, Maine. Compl. ¶ 1; O'Hara Decl. ¶ 4.

Defendant, AutoNav Marine Systems, Inc. ("**AutoNav**"), designs and manufactures manual hydraulic and electrohydraulic steering systems for marine vessels. Compl. ¶ 6. AutoNav is a Canadian corporation, with its principal place of business in Port Moody, British Columbia. Compl. ¶ 2; Declaration of Paul Wagner ¶ 3 ("**Wagner Decl.**") (ECF No. 7-1). Defendant, Paul Wagner, is the President and sole shareholder of AutoNav, which was founded in 2004.[1] Wagner Decl. ¶¶ 3, 8. Paul Wagner has never traveled to Maine, and neither he nor AutoNav has manufactured products in the state or solicited O'Hara in Maine. Wagner Decl. ¶¶ 10, 20, 22–23.

In 2012, O'Hara designed a new vessel, the F/T Araho IV, for its fleet. O'Hara Decl. ¶ 25. O'Hara hired Eastern Shipbuilding Group ("**ESG**") to serve as general

---

[1] Wagner's father, William, was also in the hydraulic steering business, and he ran Wagner Engineering until it ceased to operate in 1989. Declaration of Frank O'Hara ¶¶ 9–10, 24 ("**O'Hara Decl.**") (ECF No. 10-1); Declaration of Paul Wagner ¶ 7 ("**Wagner Decl.**") (ECF No. 7-1). Wagner Engineering is a distinct entity from AutoNav, which did not come into existence until 2004. Wagner Decl. ¶¶ 7–8; O'Hara Decl. ¶ 24.

Frank O'Hara avers that "[w]hether through AutoNav or Wagner Engineering, the Parties have had a mutually beneficial business relationship for the better part of fifty (50) years." O'Hara Decl. ¶ 10. O'Hara also claims that "Wagner built" steering systems for his various vessels in each of the following years: 1963, 1967, 1970, 1971, 1979, 1980, 1982, 1983, 1987, 1994, 2001, and 2013. O'Hara Decl. ¶¶ 11–23.  O'Hara's Declaration indicates that "Wagner" is Paul Wagner. O'Hara Decl. ¶ 2.

contractor to construct the vessel. Compl. ¶ 9; O'Hara Decl. ¶ 26. ESG built the vessel in Panama City, Florida. Wagner Decl. ¶ 11. Based on its longstanding relationship with Wagner Engineering and AutoNav, O'Hara suggested that ESG hire AutoNav to design and manufacture the vessel's steering system. Compl. ¶ 10; O'Hara Decl. ¶¶ 10, 27.

In 2012, O'Hara and AutoNav exchanged a handful of phone calls and emails to address the technical requirements for the steering system. Wagner Decl. ¶ 10. ESG sent AutoNav a purchase order dated May 30, 2013, indicating a price of $154,630. Purchase Order (ECF No. 7-3). The Purchase Order indicates that ESG would pay AutoNav 35% of the total price at the time the Purchase Order was entered, 25% six months from the date of the Purchase Order, 30% upon shipment, and 10% upon the completion of a successful sea trial. Purchase Order at 3–4.

O'Hara learned in late 2016 that Wagner and AutoNav were not performing and were unable to show any meaningful progress on the steering gear. Compl. ¶ 12. Wagner asserts that problems at ESG caused the delays and made it impossible to obtain needed certifications, which stymied AutoNav.[2] Wagner Decl. ¶¶ 12–13.

AutoNav had subcontracted with Ebco Industries, Ltd. ("**Ebco**") to manufacture parts of the steering gear for the O'Hara project, but the delays caused Ebco to take other work, and, by the time AutoNav was ready to proceed, Ebco had

---

[2]     O'Hara does not identify the reasons for the delay or dispute AutoNav's assertion that the delay was caused by problems at ESG, but O'Hara asserts generally that "AutoNav's incompetency forced O'Hara to intervene at every stage of the steering gear manufacture in order to protect its asset . . . ." O'Hara Decl. ¶ 38.

no room in its schedule. Compl. ¶ 14; Wagner ¶ 14. ESG and O'Hara were unwilling to wait another three months for Ebco to resume work, and they asked AutoNav to recommend alternative subcontractors to provide the same services. Wagner Decl. ¶ 14. AutoNav suggested that Sicom Industries, Ltd. ("**Sicom**") could complete the work that Ebco had started. Wagner Decl. ¶ 14. Ebco, however, demanded $26,517.03 to release its work to Sicom. Wagner Decl. ¶ 17; O'Hara Decl. ¶ 33. Due to AutoNav's alleged lack of funds, O'Hara paid Ebco, and O'Hara and Wagner executed a promissory note in the amount of $33,825.12 in June of 2016.[3] O'Hara Decl. ¶ 34; Promissory Note (ECF No. 6-5). The Promissory Note listed O'Hara's Rockland address, and the Note provides that it will be "governed by the laws of the State of Maine."[4] Promissory Note.

Ultimately, AutoNav designed and delivered the steering system to ESG in Florida, and ESG paid AutoNav in accordance with the Purchase Order.[5] Wagner Decl. ¶¶ 11, 20. The vessel is now in use in the Pacific Northwest. Defs.' Mot. Ex. C (ECF No. 7-4); Wagner Decl. ¶ 11.

---

[3]     The Complaint alleges and O'Hara avers that Wagner promised to pay O'Hara $26,517.03. The record is unclear, but the difference may be due to whether the amount is calculated in American or Canadian dollars. Compl. ¶ 14 (ECF No. 6-4); O'Hara Decl. ¶ 34.

[4]     O'Hara hired Sicom at a cost of $58,998.15 to finalize manufacturing. O'Hara Decl. ¶ 36. O'Hara also hired Puget Sound Hydraulics, Inc. at an additional cost of $13,446.31 for other items needed for the job. O'Hara Decl. ¶ 37. Wagner claims that AutoNav paid both Sicom and Puget Sound Hydraulics in full. Wagner Decl. ¶ 16. Neither party provided documentation. Because these facts are not particularly material to the jurisdictional question, I sidestep them.

[5]     O'Hara does not dispute that the steering system was delivered, but he asserts that the purchase price was $144,000 and ESG paid AutoNav $100,000 down and $44,000 once the steering system was delivered and running. O'Hara Decl. ¶ 29. The disputed amount and payment schedule are not material to the jurisdictional question.

O'Hara asserts that AutoNav's failure to perform set the construction schedule back months and required O'Hara to expend $98,961.49 over the originally contemplated price for the steering gear. Compl. ¶¶ 15–18. In July of 2019, the Plaintiff filed this action in state court asserting three claims: (1) breach of contract, (2) quantum meruit, and (3) unjust enrichment. Compl. ¶¶ 20–32; District Court Docket Record (ECF No. 6-1). The Defendant removed the action to this Court in October of 2019. Notice of Removal (ECF No. 1).

## LEGAL STANDARD

On a motion to dismiss under 12(b)(2), the plaintiff bears the burden of establishing that personal jurisdiction exists over the defendants. *PREP Tours*, 913 F.3d at 16. In this case, neither party requested an evidentiary hearing, and so I apply the "prima facie standard" to determine if the plaintiff has met this burden. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50–51 (1st Cir. 2002). Under the prima facie standard, the plaintiff is required to " 'proffer[ ] evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction.' " *PREP Tours,* 913 F.3d at 16 (quoting *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992)); *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 26 (1st Cir. 2008). Ordinarily, the plaintiff "is obliged to adduce evidence of specific facts" beyond the allegations of the complaint. *PREP Tours*, 913 F.3d at 16 (internal quotations omitted).

## DISCUSSION

The Defendants argue that I should not exercise personal jurisdiction over them because they lack legally sufficient contacts with Maine. Defs.' Mot. 2. The Plaintiff counters that specific personal jurisdiction exists because of the Promissory Note between Paul Wagner and O'Hara and because the parties have a business relationship spanning 50 years. Pl.'s Opp'n 1 (ECF No. 10).

## I.   Personal Jurisdiction Standard

There are two ways of establishing personal jurisdiction over a defendant: general or specific. *See Cossaboon v. Me. Med. Ctr.*, 600 F.3d 25, 31 (1st Cir. 2010). Specific jurisdiction "may only be relied upon where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." *Id.* (internal quotations omitted). General jurisdiction is broader and encompasses actions unrelated to such contacts. *Id.* The Plaintiff here asserts only that the Court has specific jurisdiction over the Defendants. Pl.'s Opp'n 5.

Personal jurisdiction must meet the requirements of the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment. *See LP Solutions LLC v. Duchossois*, 907 F.3d 95, 102 (1st Cir. 2018); *Cossaboon*, 600 F.3d at 32. Maine's long-arm statute specifically identifies the "transaction of any business within this State" as conduct conferring personal jurisdiction. 14 M.R.S.A. § 704-A(2). Maine's statute also provides that,

> to insure maximum protection to citizens of this State, [this section] shall be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the United States Constitution, 14th amendment.

*Id.* § 704-A(1); *see also LP Solutions*, 907 F.3d at 102. Under the Due Process Clause, a court may "exercise jurisdiction over an out-of-forum defendant only if, with respect to the claims at issue, the defendant has certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *PREP Tours*, 913 F.3d at 17 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (internal alterations and quotations omitted).

To establish specific jurisdiction the plaintiff must show "an affiliation between the forum and the controversy underlying the plaintiff's claims." *Id.* (quoting *Goodyear Dunlop Tire Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)) (internal alterations and quotations omitted). The First Circuit applies a three-part test to determine whether this "minimum contacts" requirement is met. *Id.* First, the plaintiff's claim must be sufficiently related to the defendant's in-forum activities; second, the defendant must have purposefully availed itself of the privilege of doing business in the forum state; and third, assertion of jurisdiction over the defendant must be reasonable. *Scottsdale Capital Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 20 (1st Cir. 2018). "Jurisdictionally speaking, each defendant must stand or fall based on its own contacts with the forum." *Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 288 n.2 (1st Cir. 1999).

The mere existence of a contract is insufficient to establish minimum contacts. *See United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 621 (1st Cir. 2001). Rather, the court must apply a "contract-plus" analysis. *See id.*; *see also Phillips Exeter*, 196 F.3d at 289. Under this approach, the focus is on "the parties' prior negotiations and

contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Daynard*, 290 F.3d at 52 (internal quotations omitted); *see also C.W. Downer & Co. v. Bioriginal Food & Science Corp.*, 771 F.3d 59, 66 (1st Cir. 2014).

## II.   Application

### A.   Relatedness

The relatedness prong of the personal jurisdiction test "ensures fundamental fairness by protecting a defendant from being hauled into an out-of-state forum based on a single contact with that forum that is wholly unrelated to the suit at issue." *Swiss Am. Bank*, 274 F.3d at 623. "[T]he claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities." *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1089 (1st Cir. 1992). "In this inquiry, foreseeability is critical." *Id.* However, this is a "flexible, relaxed standard," requiring only a "demonstrable nexus between the complaint's claims and the activities in the forum that properly may be attributed to the defendants." *PREP Tours*, 913 F.3d at 18 (internal quotations omitted).

Here, the Plaintiff asserts three contract-based causes of action that arise out of the Defendants' alleged failure to adequately and timely manufacture the steering equipment for the vessel and Paul Wagner's failure to repay the promissory note. Compl. ¶¶ 20–32. For contract claims, I determine "whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach." *Phillips Exeter*, 196 F.3d at 289; *Reed & Reed, Inc. v. George R. Cairns &*

8

*Sons, Inc.*, 519 F. Supp. 2d 148, 154 (D. Me. 2007); *Telford Aviation, Inc. v. Raycom Nat'l, Inc.*, 122 F. Supp. 2d 44, 46 (D. Me. 2000).

As an initial step, I must identify the Defendants' contacts with Maine, "since there can be no requisite nexus between the contacts and the cause of action if no contacts exist." *Swiss Am. Bank*, 274 F.3d at 621. I begin with Defendant Wagner. As the Plaintiff concedes, "the number of contacts that Wagner had with the State of Maine was limited." Pl.'s Opp'n 8. For the relatedness prong, the Plaintiff focuses entirely on the Promissory Note between O'Hara and Paul Wagner. Pl.'s Opp'n 7–8.

The Promissory Note is on O'Hara Corporation letterhead with its Rockland, Maine address. Promissory Note. It identifies "Paul Wagner, paulwagner@shaw.ca" as the "Borrower" and "O'Hara Corporation, 120 Tillson Avenue, Ste. 1, Rockland, ME 04841" as the "Lender." Promissory Note. The Note indicates that the "Borrower promises to pay to the Lender at such address as may be provided to the borrower." Promissory Note. Although the Rockland, Maine address is not specifically identified as the "payment address," it is the only address for the Lender that is given in the note. The Promissory Note indicates that "This Note will be construed in accordance with and governed by the laws of the State of Maine." [6] Promissory Note. Wagner admits that he signed the note, although he now disputes its validity. Wagner Decl. ¶ 19. I set aside the dispute on the merits as not germane to the personal jurisdiction

---

[6]     The Plaintiff claims that the Promissory Note "included a clause permitting jurisdiction in the courts of the State of Maine." Pl.'s Opp'n 7 (ECF No. 10). The Promissory Note states only: "This Note will be construed in accordance with and governed by the laws of the State of Maine." Promissory Note (ECF No. 6-5). It says nothing about jurisdiction in the courts of the State of Maine.

analysis. Neither Wagner nor AutoNav ever made any payment on the Promissory Note. Wagner Decl. ¶ 20. Collection efforts were made by O'Hara from Maine. O'Hara Decl. ¶ 39.

Wagner concedes that he communicated by telephone and email with O'Hara in Maine about "how to address vendor/subcontractors." Wagner Decl. ¶ 22. Wagner contends, and O'Hara does not dispute, that O'Hara "demanded as a condition of continuing further work on the Project, that [Wagner] personally assure and promise to pay O'Hara $33,825.12 Canadian dollars based on the release payment that O'Hara asserts it made to Ebco . . . ." Wagner Decl. ¶ 19; O'Hara Decl. ¶ 34. While O'Hara does not claim that Wagner solicited the payment, the breach of the Promissory Note arguably occurred in Maine, because Wagner was obliged to send payment to the Plaintiff's office in Rockland, Maine. Although "the location where payments are due under a contract alone does not possess decretory significance," it is some indication that Wagner had at least some minimal contacts with the State of Maine that are related to the subject of the litigation. *Philips Exeter*, 196 F.3d at 291.

The Plaintiff claims that this litigation centers around the Promissory Note, but the claims in the Complaint are considerably broader than the Note, which relates only to the payment O'Hara made to Ebco. Compl. ¶ 14. The litigation as a whole arises out of AutoNav's alleged incompetence and untimeliness, which set the construction schedule back months and drove up costs. Compl. ¶¶ 15, 18. Each of the Counts brought by the Plaintiff includes AutoNav's performance under its contract

with ESG. Compl. ¶¶ 21, 27, 31. Thus, the Complaint involves the overall arrangement between ESG, O'Hara, and AutoNav.

Moreover, the Promissory Note was executed by Wagner alone. The Plaintiff points to no contacts that AutoNav had with Maine, although Wagner himself acknowledges that "O'Hara and AutoNav exchanged a few telephone calls and emails addressed to technical issues to provide AutoNav with a better sense of the technical requirements for the Project for ESG." Wagner Decl. ¶ 10. These isolated contacts are insufficient to establish relatedness.

In sum, as to the relatedness prong, I conclude that the Plaintiff has established a demonstrable nexus between its claims related to the Promissory Note and the minimal activities in the forum that can be attributed to Paul Wagner, and that Wagner's contacts with the forum, while not instrumental to the formation of the contract were essential to its breach. I further conclude that the claims against AutoNav are unrelated to the forum state.

### B.    Purposeful Availment

The second prong—the purposeful availment inquiry—focuses on the defendant's "intentionality." *Swiss Am. Bank*, 274 F.3d at 623. The plaintiff must point to "some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King v. Rudzewicz*, 471 U.S. 462, 474 (1985) (internal quotations omitted); *see also PREP Tours*, 913 F.3d at 19. Due to the nature of this inquiry, "the two cornerstones of purposeful availment are voluntariness and foreseeability." *Id.* at 19–20 (internal quotations omitted). Voluntariness requires

11

that the defendant's contacts with the forum "proximately result" from the defendant's own actions, rather than the unilateral action of another. *Id.* at 20. Foreseeability requires a showing that the defendant's connections with the forum "are such that he should reasonably anticipate being haled into court there." *Id.* (quoting *Burger King*, 471 U.S. at 474) (internal quotations omitted). Thus, "random, fortuitous, or attenuated contacts" are insufficient. *Knox v. MetalForming, Inc.*, 914 F.3d 685, 691 (1st Cir. 2019) (internal quotations omitted). In contract cases, jurisdiction can be "reasonably foreseeable when the defendant deliberately directed its efforts toward the forum state" or "entered a contractual relationship that envisioned continuing and wide-reaching contacts in the forum State." *LP Solutions*, 907 F.3d at 104 (internal alterations and quotations omitted).

To establish purposeful availment, the Plaintiff avers that the parties have had a longstanding business relationship, ticking off the many steering systems that O'Hara purchased from Wagner[7] over the past fifty years. Pl.'s Opp'n 10–11; O'Hara Decl. ¶¶ 2, 11–22. Setting aside the Plaintiff's confusing conflation of Paul Wagner with his father and AutoNav with Wagner Engineering,[8] the fundamental problem

---

[7]     Frank O'Hara asserts, and I accept as true, that "Wagner"—defined in his declaration as "Paul Wagner"—built the various steering systems. O'Hara Decl. ¶¶ 2, 11–22.

[8]     The Plaintiff plays fast and loose with the various entities. O'Hara avers that "whether through AutoNav or Wagner Engineering, the Parties have had a mutually beneficial business relationship for the better part of fifty (50) years." O'Hara Decl. ¶ 10. "Wagner Engineering, which was founded by the Defendant's father, William Wagner, in the first part of the twentieth century," O'Hara Decl. ¶ 9, ceased doing business in 1989. Wagner Decl. ¶ 7. O'Hara does not specify when or how Paul Wagner was involved in Wagner Engineering. And although O'Hara claims that Wagner Engineering was the predecessor to AutoNav, O'Hara Decl. ¶ 9, AutoNav did not come into existence until 2004. Wagner Decl. ¶¶ 7–8. At one point, O'Hara concedes that the Wagner Engineering and AutoNav may be separate legal entities. O'Hara Decl. ¶ 24. " 'A corporation's contacts with a forum may be imputed to its successor if forum law would hold the successor liable for the actions of its predecessor.' " *Doucet v. FCA US LLC*, No. 19-CV-10514-ADB, 2020 WL 128655, at *3 (D. Mass. Jan. 10, 2020) (quoting

with the Plaintiff's purposeful availment argument is that it fails to tether the claimed historical contacts to the forum state. Although I understand that O'Hara has its principal place of business in Maine, the facts involving the F/T Araho IV demonstrate that it is possible that O'Hara used out-of-state contractors to build the other vessels and that Wagner had little or nothing to do with Maine on those projects. I cannot speculate about details that are within O'Hara's knowledge but that O'Hara does not provide. Defendant Wagner asserts, without dispute, that he has not had any business dealings with O'Hara that implicate Maine except for very limited emails and that he did not provide any services or sell any goods to O'Hara in Maine. Wagner Decl. ¶ 23. As for AutoNav, it was not even in existence during the time when the other vessels were built. Accordingly, the Plaintiff's fifty-year business relationship with Wagner does not establish that the Defendants purposefully availed themselves of the privilege of doing business in Maine.

As to the steering system for the F/T Araho IV, neither Paul Wagner nor AutoNav deliberately sought to do business in Maine. And neither Defendant entered a contract that envisioned continuing and wide-reaching contacts here. *See id.* ESG, the Florida general contractor for the buildout of the vessel, solicited AutoNav to provide a steering system. Compl. ¶¶ 9–11. ESG entered into a contract with AutoNav with the understanding that the steering system would be manufactured in Canada

---

*McClary v. Erie Engine & Mfg. Co.*, 856 F. Supp. 52, 57 (D.N.H. 1994)). But here the record does not support a conclusion that AutoNav is a corporate successor to Wagner Engineering. Similarly, William Wagner is a separate legal entity from Paul Wagner. Contacts with William Wagner cannot be imputed to Paul Wagner.

and shipped to ESG in Florida. Purchase Order at 1. The steering system was delivered to Florida, where it was installed and successfully sea-tested by ESG. Wagner Dec. ¶ 15. ESG paid AutoNav from Florida. Wagner Decl. ¶ 15. The vessel is now being operated in the Pacific Northwest. Wagner Decl. ¶ 11. Clearly, as to the overall contract for the steering system, neither Paul Wagner nor AutoNav could have foreseen being haled to Maine to defend a lawsuit.

Even as to the Promissory Note, the Plaintiff has not established purposeful availment. Paul Wagner did not solicit O'Hara to pay Ebco. O'Hara Decl. ¶ 27; Wagner Decl. ¶¶ 10, 20, 22–23. At O'Hara's insistence, Paul Wagner promised to repay O'Hara for the Ebco release payment. Though not determinative, lack of solicitation in Maine weighs against finding that the Plaintiff has established purposeful availment. *See LP Solutions*, 907 F.3d at 104; *see also Adams v. Adams*, 601 F.3d 1, 6–7 (1st Cir. 2010) ("[T]he fact that [the defendant] accepted funds from an individual who happened to be a Massachusetts resident and executed a promise to repay that individual does not persuade us that he should have foreseen that he could be haled into court in Massachusetts."). By the terms of the Promissory Note, Wagner would not have envisioned continuing and wide-reaching contacts with Maine. The Promissory Note envisions repayment within two months. *See* Promissory Note.[9]

---

[9]     The Plaintiff suggests that Paul Wagner was required to make "monthly" payments on the promissory note, Pl.'s Opp'n 3, O'Hara Decl. ¶ 34, but the document shows that the only repayment requirement was that the total amount be repaid by August 15, 2016. Promissory Note; *see also PREP Tours, Inc. v. Am. Youth Soccer Org.*, 913 F.3d 11, 24 (1st Cir. 2019) (not accepting plaintiff's characterization of communications that were undermined by the undisputed record).

The Promissory Note did contain a choice-of-law provision establishing that Maine law would apply to any disputes, which is relevant but not dispositive for a finding of purposeful availment.[10] *LP Solutions, LLC v. Duchossois*, No. 2:18-CV-25-DBH, 2018 WL 1768037, at *9 (D. Me. Apr. 11, 2018), *aff'd*, 907 F.3d 95 (1st Cir. 2018) (citing *Burger King*, 471 U.S. at 482). Although a choice-of-law clause can tip the scale toward a finding of purposeful availment if there is otherwise a significant relationship with a forum State, that is not the case here. *See Ganis Corp. of Cal. v. Jackson*, 822 F.2d 194, 198 (1st Cir. 1987) (citing *Burger King*, 471 U.S. at 482) (defendant's actual dealings with forum state over five-year business relationship, plus choice-of-law provision, supported exercise of personal jurisdiction).

Paul Wagner had limited communications with O'Hara via phone and email prior to executing the Promissory Note, and he sent the signed agreement to O'Hara in Maine, but he never sent payment to Maine[11] or otherwise performed under the Promissory Note in Maine. Wagner Decl. ¶¶ 22–24. These isolated and occasional contacts fall short of the "stream of payments" or "plethora of activities" that can

---

[10]  By contrast, "a forum selection clause . . . in conjunction with a choice-of-law provision can make jurisdiction 'eminently foreseeable.' " *LP Solutions, LLC v. Duchossois*, No. 2:18-CV-25-DBH, 2018 WL 1768037, at *9 n.17 (D. Me. Apr. 11, 2018), *aff'd*, 907 F.3d 95 (1st Cir. 2018) (quoting *Bluetarp Fin., Inc. v. Matrix Const. Co.*, 709 F.3d 72, 82 (1st Cir. 2013)). Despite the Plaintiff's statement to the contrary, *see* Pl.'s Opp'n 12 n.2, the Promissory Note did not contain a forum selection clause. Promissory Note.

[11]  O'Hara's attempts to contact the Defendants and secure payment, O'Hara Decl. ¶ 39, are not relevant because the unilateral acts of the Plaintiff cannot establish the Defendant's purposeful availment. *See PREP Tours*, 913 F.3d at 27 (citing *Burger King v. Rudzewicz*, 471 U.S. 462, 474 (1985)); *see also Adams v. Adams*, 601 F.3d 1, 7 (1st Cir. 2010) ("A phone call from [the plaintiff in Massachusetts] to [the defendant] in Texas concerning a contract that [the plaintiff] demanded that [the defendant] execute is not sufficient evidence that [the defendant] 'reached into' Massachusetts.").

establish purposeful availment. *See LP Solutions*, 907 F.3d at 105–06 (citing *Baskin-Robbins*, 825 F.3d at 38–39). The fact that Wagner "entered into a tendered relationship does not carry the day," where he did not reach out into Maine to solicit that contract. *See Phillips Exeter*, 196 F.3d at 292.

I conclude that neither AutoNav nor Paul Wagner purposefully availed themselves of the privilege of conducting activities within the forum State.

### C.    Reasonableness

The third prong of the three-part test considers the reasonableness of exercising personal jurisdiction over a defendant. The five "Gestalt factors" typically applied to assess the reasonableness are: (1) the burden on the defendant of appearing: (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) judicial economy; and (5) the "common interests of all sovereigns in promoting substantive social policies." *Adelson v. Hananel*, 510 F.3d 43, 51 (1st Cir. 2007). Courts assess these factors on a "sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction." *Baskin-Robbins*, 825 F.3d at 40 (internal quotations omitted).

In this case, the Gestalt factors favor the Defendants. There is no evidence in this record that either Paul Wagner or AutoNav sought to do business in Maine. They were approached by ESG, a Florida company, to provide a steering system for a vessel being built in Florida. They contracted with ESG, not O'Hara, to deliver that steering system. When a dispute arose over the payment of AutoNav's subcontractor, Ebco,

16

O'Hara required Paul Wagner to sign a Promissory Note to ensure that O'Hara would be reimbursed for its release payment to Ebco.

Requiring the Defendants to appear in Maine would be extremely burdensome. They operate out of British Columbia, Canada, roughly three thousand miles from Portland, Maine, and, particularly with flights restricted due to a global pandemic, travel would carry risks and be difficult. While Maine has an interest in adjudicating the disputes of businesses within its borders, the Defendants were not in any sense conducting ongoing or continuous business in Maine. The Plaintiff no doubt has an interest in obtaining relief near its principle place of business in Rockland, Maine, but the Plaintiff does not dispute that it also has offices in Seattle, Washington. O'Hara Decl. ¶ 4; Wagner Decl. ¶ 9. The witnesses involved in this case will likely hale from either the British Columbia/Washington State area (Ebco, Sicom, Puget Sound Hydraulics) or Florida (ESG). The most efficient resolution of this dispute would be in one of those locations. The common interests of all sovereigns would be to provide judicial access in a forum where the most efficient resolution can be achieved. On balance, the reasonableness factors tip toward the Defendants.

## CONCLUSION

Although Paul Wagner's signing of the Promissory Note tendered by O'Hara makes some of the claims against him related to Maine, he did not purposefully avail himself of doing business in Maine and allowing O'Hara to hale him into Maine to defend this action is not reasonable. AutoNav has had virtually no contacts with Maine related to this litigation aside from isolated phone or email communications to

17

get design specifications from O'Hara at the beginning of the project. AutoNav did not purposefully avail itself of doing business in Maine, and allowing O'Hara to bring AutoNav to Maine is also not reasonable. Because I find that neither Defendant has had sufficient contacts with Maine to support personal jurisdiction over them, I **GRANT** the Defendants' motion to dismiss.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 27th day of May, 2020.

18